CITY NATIONAL BANK OF FORT SMITH v. FIRST
NATIONAL BANK AND TRUST COMPANY OF
ROGERS, et al.

CA 86-471                                              732 S.W.2d 489

Court of Appeals of Arkansas
Division I
Substituted Opinion on Denial of Rehearing
September 23, 1987.*

*Original opinion delivered July 8, 1987.

*Harper, Young, Smith & Maurras*, by: *S. Walton Maurras*, for appellant.

*Cypert, Crouch, Clark & Harwell*, by: *James E. Crouch*, for appellee Northwest National Bank.

*Kelley & Luffman*, by: *Eugene T. Kelley*, for appellee First National Bank and Trust Company of Rogers and First National Bank of Siloam Springs.

JAMES R. COOPER, Judge. First National Bank and Trust Company of Rogers, Arkansas (First Rogers) and First National Bank of Siloam Springs, Arkansas (First Siloam) brought an action against Northwest National Bank (Northwest) on a $409,000.00 letter of credit, dated April 15, 1983, issued by

Northwest to First Rogers. Northwest filed a third-party complaint against City National Bank of Fort Smith, Arkansas (City National), alleging that City National had participated in the letter of credit to the extent of $309,000.00, and asking that the letter of credit be reformed to reflect City National's liability in the amount of $309,000.00, and Northwest's liability in the amount of $100,000.00. After a trial, it was ordered that First Rogers and First Siloam have judgment against Northwest in the amount of $409,000.00, plus interest and costs, and that Northwest have judgment against City National for $309,000.00, plus interest and costs. From that decision, comes this appeal.

The evidence shows that the letter of credit arose out of a project initiated by Thomas Comley. In 1983, Comley formed the Shadyridge Limited Partnership in order to build and operate an apartment project. The construction of the project was financed by housing bonds issued through First Rogers. One of First Rogers's loan requirements was for Shadyridge to obtain a letter of credit in the amount of $409,000.00 for the benefit of First Rogers. Shadyridge obtained the $409,000.00 letter of credit from Northwest on April 15, 1983. City National agreed to participate in the letter of credit to the extent of $309,000.00. The terms of City National's participation were set out in a letter of commitment issued from City National to Northwest on April 13, 1983. City National's letter of commitment set forth several conditions upon which its participation was based, including the conditions that Northwest would have a second mortgage on the then-unbuilt apartment complex, and that Northwest would have a security interest in the Raspberry note, a contract of sale between M. O. Raspberry and Thomas Comley.

On August 16, 1984, First Rogers assigned a $329,000.00 participation in the letter of credit to First Siloam, and Northwest acknowledged notice of the assignment. Whether Northwest effectively notified City National of the assignment is a subject of dispute; the chancellor found that, at some point, City National received a copy of the assignment. Between December 27, 1984, and March 15, 1985, First Rogers advanced $80,000.00 under a note secured by the $409,000.00 letter of credit. Between August 27, 1984, and August 28, 1984, First Siloam advanced $329,000.00 under a note which was also secured by the letter of credit. Whether these advances were made to Thomas Comley personally, or to Comley as agent for Shadyridge, is disputed on appeal.

In October 1984 Comley pledged the Raspberry note to McIlroy Bank and Trust Company of Fayetteville, Arkansas, as security for a $324,000.00 letter of credit which otherwise is unrelated to the issues in the case at bar. In April 1985, Thomas Comley and Fran Sabbe, an employee of Northwest, met with George Beattie, the loan officer for City National who was handling the Shadyridge account. They discussed extending the expiration date of the letter of credit to December 31, 1985, and the release of the Raspberry note as collateral for the letter of credit. They agreed to extend the letter of credit's expiration date. The appellant, City National, denies that Beattie agreed to release the Raspberry note as collateral. The appellee and cross-appellant, Northwest, asserts that Beattie did authorize Northwest to release the note as collateral. It is undisputed that Northwest did in fact release the Raspberry note on May 9, 1985.

On August 21, 1985, First Rogers made a written demand upon Northwest under the $409,000.00 letter of credit, and subsequently added City National's name to the demand at the request of Northwest. Northwest offered to pay First Rogers $100,000.00 on the letter of credit in exchange for a release, but First Rogers refused. City National subsequently denied liability on its participation in the letter of credit and refused to pay. With both Northwest and City National refusing to fully honor the letter of credit, First Rogers and First Siloam filed the action which gave rise to this appeal.

For reversal, the appellant, City National, contends that Northwest failed to prove that City National agreed to release the Raspberry note as collateral; that any agreement by City National to release the Raspberry note is void for lack of consideration; that First Rogers's assignment of a $329,000.00 interest in the letter of credit to First Siloam had the effect of releasing City National from its obligation; that Northwest's release of the Raspberry note as collateral released City National from liability; that the chancellor erred in excluding the testimony of Tom Reed, a witness called by City National; and that the chancellor erred in permitting Fran Sabbe to testify concerning an oral modification of the written letter of commitment which set forth the terms of City National's participation in the letter of credit.

The appellee and cross-appellant, Northwest, disputes City National's contentions and additionally argues that the chancellor erred in failing to find that no demand on the letter of credit was made on Northwest by First Siloam; that a condition

precedent to First Rogers's and First Siloam's right to demand payment of the letter of credit did not exist; that the chancellor erred in failing to find that Northwest's issuance of the letter of credit in the amount of $409,000.00 was unenforceable as an illegal contract; and that the chancellor erred in awarding thirteen percent interest.

We first address the points for reversal advanced by the appellant, City National. The appellant initially contends that Northwest failed to prove that City National agreed to the release of the Raspberry note as collateral. Citing *APCO Oil Corp.* v. *Stephens*, 270 Ark. 715, 606 S.W.2d 134 (Ark. App. 1980), the appellant argues that clear and convincing evidence is required to prove an oral modification to a written agreement, and asserts that Northwest did not present clear and convincing evidence that City National consented to the release of the Raspberry note. Although the appellant correctly states that an oral modification of a prior written contract must be established by clear and convincing evidence, *Freeman* v. *Freeman*, 20 Ark. App. 12, 722 S.W.2d 877 (1987), a requirement that the evidence be "clear and convincing" does not mean that the evidence must be uncontradicted. *Freeman*, 20 Ark. App. at 15.

The evidence in the case at bar shows that, on April 4, 1985, Thomas Comley, Fran Sabbe of Northwest, and George Beattie of City National met to discuss the extension of the letter of credit's expiration date to December 31, 1985, and the release of the Raspberry note as collateral. At this meeting, Comley asked Beattie to release the note, and told him that there was enough equity in the apartment complex to secure the debt. Because the release of the note would leave only a second mortgage on the apartment complex as collateral, Beattie indicated that he would need to see the apartments and review his file before agreeing to release the note. Fran Sabbe telephoned Beattie several times during April 1985 to discuss the extension of the letter of credit and the release of the collateral. Beattie viewed the apartment complex on May 1, 1985, and was favorably impressed with the project, which was by then virtually complete.

The most significant point of divergence in the testimony of the witnesses centers upon a conversation between Sabbe and Beattie that took place on May 8 or 9, 1985. Sabbe testified that Beattie agreed to extend the letter of credit until December 31, 1985, and that Beattie made no objection when Sabbe stated that it was her understanding that the extension would be secured only

by the second mortgage on the project. Sabbe followed up this conversation with a letter to Beattie dated May 10, 1985, in which she enclosed a new promissory note and mortgage. The promissory note, dated April 15, 1985, stated that the note was secured by a second mortgage on the Shadyridge apartment complex. The Raspberry note was not listed as collateral. Sabbe later received a letter from Beattie, dated May 28, 1985, in which Beattie acknowledged receipt of the documents. Despite the fact that the Raspberry note was not listed as collateral on the promissory note, Beattie made no objection to the release of the Raspberry note.

Beattie's testimony concerning the events leading up to the release of the Raspberry note is markedly different from Sabbe's account. He stated that he had no recollection of any request by Comley or Northwest to release the note as collateral. With respect to the promissory note of April 15, 1985, Beattie testified that the fact that a box on the note was checked to indicate that the promissory note was secured by a U.C.C. security interest led him to believe that there were two items of collateral securing the promissory note, a mortgage and the Raspberry note. The appellant contends that Beattie's letter of May 28, 1985, indicates that he had not consented to the release of the Raspberry note as collateral, because in that letter he refused to execute a participation agreement, forwarded by Sabbe, which would have given Northwest the right to release collateral without City National's consent. Beattie's letter also shows that he was unaware that any disbursements had been made under the letter of credit when, in fact, disbursements had been made for the entire $409,000.00 amount of the letter of credit.

Although chancery cases are tried *de novo* on appeal, we do not reverse the chancellor's findings of fact unless they are clearly erroneous. *Ballard* v. *Carroll*, 2 Ark. App. 283, 621 S.W.2d 484 (1981). We review the evidence in the light most favorable to the appellee, and indulge all reasonable inferences in favor of the decree. *Id.*, 621 S.W.2d at 486. The chancellor in the case at bar found that City National, through Beattie, agreed to the release of the Raspberry note as collateral. When the burden of proving a disputed fact in chancery is by "clear and convincing" evidence, the question on appeal is whether a finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *Freeman* v. *Freeman, supra.*

Viewing the evidence in the light most favorable to

the appellee, we cannot say that the evidence that City National released the Raspberry note as collateral is not clear and convincing. Although some of the evidence is circumstantial, circumstantial evidence may be sufficient to show that the parties entered into a contract. *Steed* v. *Busby*, 268 Ark. 1, 593 S.W.2d 34 (1980). Moreover, the chancellor's opportunity to assess the credibility of the witnesses is especially important where, as here, the testimony is in hopeless conflict. Although the appellant argues that the fact that the U.C.C. box was checked on the April 15, 1985, promissory note had the effect of leading Beattie to believe that the promissory note was secured by the Raspberry note, we do not think that the promissory note was intrinsically misleading: City National's vice-president for commercial lending, Larry Smith, reviewed the Shadyridge file when Beattie was on vacation in the summer of 1985, and was able to determine from his review that the Raspberry note was no longer listed as collateral. Furthermore, the evidence makes it clear that Beattie reviewed the documents sent to him by Sabbe and objected to various provisions set out therein. Despite this evidence of close scrutiny, there is no indication that Beattie ever objected to the Raspberry note's release until after the letter of credit had been called. Under these circumstances, we hold that the chancellor did not err in finding that Beattie agreed to the release of the Raspberry note.

■ The appellant next contends that City National's agreement to release the Raspberry note is void for lack of consideration, and argues that City National Bank obtained no benefit in exchange for its agreement to release the note. We disagree. Both Northwest and City National agreed to release the collateral and extend the letter of credit, and mutual promises constitute consideration for each other. *Freeman, supra.*

■ City National also contends that it is released from its duty to honor the letter of credit because First Rogers assigned a $329,000.00 interest in the letter of credit to First Siloam. This contention is based upon Ark. Stat. Ann. § 85-5-116(1) (Supp. 1985), which provides that "[t]he right to draw under a credit can be transferred or assigned only when the credit is expressly designated as transferable or assignable." We find no merit in the appellant's argument. The chancellor specifically found that the right to call the letter of credit remained with First Rogers, despite the partial assignment of an interest therein to First Siloam. A chancellor's findings of fact will not be reversed on appeal unless they are clearly against the preponderance of the

evidence. *Pennybaker* v. *Pennybaker, supra.* We review the evidence in the light most favorable to the appellee, indulging all reasonable inferences in favor of the decree, and giving due deference to the chancellor's superior opportunity to judge the credibility of the witnesses. *Cox* v. *Cox, supra; Gooch* v. *Gooch, supra.*

The evidence shows that the terms of the partial assignment of the letter of credit provided that all terms of the original letter of credit remained in effect. This would include the required procedure that the letter of credit was to be called by First Rogers, accompanied by First Rogers' signed statement that the amount drawn was due in connection with a loan to Shadyridge. Although there was some testimony to the effect that First Siloam's officers were consulted by First Rogers and consented to First Rogers calling the letter of credit, the evidence clearly shows that the actual call was made by First Rogers, with the notation that the amount was drawn under Northwest's letter of credit. In light of the evidence that the partial assignment preserved the original terms of the letter of credit, and that the letter of credit was in fact called under the terms specified in the original agreement, we hold that the chancellor did not err in finding that the right to call the letter of credit remained with First Rogers, and that the assignment of an interest in the letter of credit to First Siloam did not release City National from its duty to honor the letter of credit.

We do not reach the appellant's contention that City National is released from liability because the assignment was in violation of Ark. Stat. Ann. § 85-3-407(1)(a) (Repl. 1961), because there is no indication in the abstract that the possibility of a violation of this statute was raised in the trial court. Arkansas courts have consistently held that issues raised for the first time on appeal will not be considered. *Ferguson* v. *City of Mountain Pine,* 278 Ark. 575, 647 S.W.2d 460 (1983). Moreover, we do not think that the appellant's argument would be found to have merit even had it been properly preserved for appeal. Section 85-3-407 (Repl. 1961) deals with alterations of an *instrument.* An instrument is defined in Ark. Stat. Ann. § 85-3-102(1)(e) (Repl. 1961) as a negotiable instrument. To be a negotiable instrument, a writing must "contain an unconditional promise or order to pay a sum certain in money and no other promise, order, obligation or power given by the maker or drawer except as authorized by this Article." Ark. Stat. Ann. § 85-3-104(1)(b) (Repl. 1961). The letter of credit in the case at bar did not contain an unconditional

promise or order to pay; instead, payment was specifically conditioned upon receipt of a signed statement that the amount drawn was due in connection with a loan to Shadyridge, Ltd. Even if the letter of credit in the case at bar were considered to be a negotiable instrument, City National would be discharged under § 85-3-407 only in the event of an alteration by the holder that was both material and fraudulent, and City National has failed to prove that the assignment of an interest in the letter of credit to First Siloam was made for a fraudulent purpose. Thus, we think that the appellant's argument would fail, even had it been raised below.

Next, the appellant contends that the release of the Raspberry note as collateral released City National from liability. This contention is based on Ark. Stat. Ann. § 85-3-606 (Repl. 1961), which, in pertinent part, provides that "[t]he holder discharges any party to the instrument to the extent that *without such party's consent* the holder (b) unjustifiably impairs any collateral for the instrument. . . ." (Emphasis supplied.) We need not decide whether the letter of credit in the case at bar was a negotiable instrument in order to address the appellant's contention, because we have affirmed the chancellor's finding that City National consented to Northwest's release of the Raspberry note as collateral. In light of that finding, the appellant's argument lacks merit.

The appellant also argues that the chancellor erred in excluding the testimony of Tom Reed, a witness called by City National. We do not reach this contention, for the appellant has failed to cite any authority in support of its position. Assignments of error unsupported by convincing arguments or authority will not be considered on appeal unless it is apparent without further research that the assignments of error are well taken. *Western Auto Supply Co.* v. *Bank of Imboden*, 17 Ark. App. 4, 701 S.W.2d 394 (1985). In light of the fact that City National never listed Reed as a witness in its answers to interrogatories, we do not think the appellant's argument is so convincing as to merit consideration on appeal in the absence of citation to authority.

The appellant next asserts that the chancellor erred in permitting Fran Sabbe to testify concerning the oral agreement to release the Raspberry note as collateral, and argues that Sabbe's testimony was improper as parol evidence introduced to change or alter a contract in writing. Although it is true that the Parol Evidence Rule prohibits the introduction of evidence of all

prior or contemporaneous agreements of the parties which would vary the express terms of their written agreement, *see Sterling* v. *Landis*, 9 Ark. App. 290, 658 S.W.2d 429 (1983), it is well established that this rule is not violated by proof of a subsequent oral agreement modifying the terms of a written one. *Id.*, 658 S.W.2d 429. Because Sabbe's testimony was not offered to prove an agreement that was prior to or contemporaneous with the agreement embodied in the letter of commitment between City National and Northwest, but instead related to an oral agreement reached after the letter of commitment had been executed, we hold that the chancellor did not err in admitting Sabbe's testimony.

We next address the contentions advanced by the cross-appellant, Northwest, for reversal of the decree entered against it in favor of First Rogers and First Siloam. Northwest first contends that the failure of First Siloam to call the letter of credit precludes First Siloam from seeking a judgment on it arguing that First Rogers assigned to First Siloam the duty of calling the letter of credit. We disagree. Although we have said that an assignment couched in general terms is an assignment of the assignor's rights and a delegation of his unperformed duties under the contract unless the language or the circumstances indicate the contrary, *see Newton* v. *Merchants & Farmers Bank*, 11 Ark. App. 167, 668 S.W.2d 51 (1984), we think that both the language of the assignment and the circumstances of the case at bar indicate that First Siloam was not assigned the duty of calling the letter of credit. The partial assignment provided that it was to operate upon the same conditions as the letter of credit. One of the conditions of the credit was that it was to be called by First Rogers under a draft drawn on Northwest. Moreover, there is no evidence to show that First Siloam ever intended to assume First Rogers's duty of calling the letter of credit; to the contrary, First Siloam has neither claimed the right to call the letter of credit nor attempted to do so. We think that the evidence clearly shows that the purpose of the assignment was merely to provide security for First Siloam's loan to Comley, and that no delegation of duties was intended. Under these circumstances, we hold that the chancellor did not err in failing to dismiss First Siloam's complaint against Northwest.

Next, Northwest contends that the conditions for First Rogers to call the letter of credit did not exist. This argument is without merit. Northwest states in its brief that the letter of credit required First Rogers to state in its call that the First Rogers's

loan to Shadyridge was due, and argues that this condition was not satisfied because there is no evidence to show that First Rogers's loan was to Shadyridge, Ltd., as opposed to Thomas Comley individually. However, the letter of credit did not require that the loan be made to Shadyridge *per se*, but only provided that the demand must specify that the amount drawn was *in connection with* the loan to Shadyridge, Ltd. Because the record clearly shows that the proceeds of the loans to Comley were deposited in the account of Shadyridge, Ltd., we hold that First Rogers's demand met the conditions set out in the letter of credit.

Northwest next asserts that the chancellor erred in failing to find that Northwest's issuance of the letter of credit in the amount of $409,000.00 was unenforceable as an illegal contract. Northwest's argument is based upon 12 U.S.C. § 84 (1982), which sets lending limits for national banks. Virginia Morris, Northwest's chief executive officer, testified that Northwest's lending limit with respect to the Shadyridge letter of credit was approximately $105,000.00. She further stated that Northwest could avoid exceeding its lending limit by having another bank participate, and that City National was asked to participate in the letter of credit. Because Northwest had never before engaged in a participation involving a letter of credit, she asked David Marley of City National for guidance, and sent all of the paperwork to Marley for approval. When Ms. Morris asked Marley whether two letters of credit should be issued, one from Northwest and another from City National, Marley told her that only one letter of credit should be issued, and that it should be issued by Northwest, to which the request had originally been addressed. Finally, Morris stated that she made First Rogers aware of City National's participation by notifying two of First Rogers's officers, James Glenn and John Carpenter. Northwest asserts that its issuance of the letter of credit in the amount of $409,000.00 violated the lending limits imposed by 12 U.S.C. § 84 (1982), and that the letter of credit is thus an illegal contract which cannot be enforced.

The general rule with respect to illegal contracts is that neither courts of law nor of equity will interpose to grant relief to the parties, if they have been equally cognizant of the illegality. *Womack* v. *Maner*, 227 Ark. 786, 301 S.W.2d 438 (1957). An exception to the general rule exists, however, in cases where the party suing, though *particeps criminis*, is not *in pari delicto* with the adverse party: under those circumstances, the party suing will not be barred from asserting rights under the

transaction. *Dillard* v. *Kelley*, 205 Ark. 848, 171 S.W.2d 53 (1943). We think that First Rogers's knowledge of Northwest's loan limit is the crucial factor in determining whether First Rogers was *in pari delicto* with Northwest with respect to Northwest's asserted violation of the federal statute governing lending limits. *See National Farmers Organization, Inc.* v. *Kinsley Bank*, 731 F.2d 1464 (10th Cir. 1984). In its brief, Northwest states that Ms. Morris testified that she made First Rogers aware of the lending limit problem and the need for City National's participation. Although it is true that Ms. Morris stated that both Comley and City National were aware that the participation was required in order to avoid exceeding Northwest's lending limit, we find no indication in the record that First Rogers was also made aware of the lending limit problem. Instead, Morris merely stated that she made First Rogers aware of City National's participation by contacting Glenn and Carpenter. Glenn testified that, while he was aware of City National's participation in the letter of credit, he did not suspect that the reason for the participation was that Northwest had a problem with its lending limits. On this record, we cannot say that First Rogers was aware that Northwest exceeded its lending limit in issuing the letter of credit, and that First Rogers was thus *in pari delicto* with Northwest concerning any violation of 12 U.S.C. § 84 that may have occurred. The law will not presume that the parties to a contract intended an illegal act. *Stroud* v. *Pulaski County Special School District*, 244 Ark. 161, 424 S.W.2d 141 (1968). We therefore hold that First Rogers was not precluded from enforcing the letter of credit against Northwest in the amount of $409,000.00.

■ We finally address Northwest's contention that the chancellor erred in awarding interest at the rate of thirteen percent. Northwest argues that the letter of credit was a contract in which no rate of interest was agreed upon, and that prejudgment interest is thus limited to six percent per annum under Ark. Const. art. 19, §13, amend. 60, § 1(d)(i) (1982). We agree. *See Rest Hills Memorial Park, Inc.* v. *Clayton Chapel Sewer Improvement District*, 6 Ark. App. 180, 639 S.W.2d 519 (1982). Although the promissory note which First Rogers issued to Comley provided for interest at the rate of thirteen percent, the letter of credit itself made no provision for the payment of interest. We therefore modify the chancellor's decree to provide for the payment of prejudgment interest at the rate of six percent

rather than the thirteen percent rate the chancellor awarded.

Affirmed on direct appeal.

Affirmed as modified on cross-appeal.

CORBIN, C.J., and CRACRAFT, J., agree.